GWICH'IN STEERING COMMITTEE, a nonprofit village-based Athabascan organization, Appellant/Cross–Appellee,

v.

STATE of Alaska, OFFICE OF THE GOVERNOR, Appellee/Cross–Appellant.

Nos. S–9026, S–9046.

Supreme Court of Alaska.

Oct. 13, 2000.

Robert W. Randall, Trustees for Alaska, Anchorage, for Appellant/Cross–Appellee.

Christopher Kennedy, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Invoking Alaska's Public Records Act, an organization asked the governor of Alaska to produce documents relating to the governor's lobbying efforts to open the Arctic National Wildlife Refuge for oil exploration and drilling. The governor withheld the documents, claiming privilege. In the ensuing administrative appeal, the superior court held that the deliberative process privilege protected the documents from disclosure. We affirm because we conclude that the documents are predecisional and deliberative, and because the requesting organization did not establish that its need for the documents outweighed the governor's interest in nondisclosure.

### II. FACTS AND PROCEEDINGS

The Gwich'in Steering Committee characterizes itself as a nonprofit organization formed to protect the birthplace and nursing grounds of the Porcupine Caribou Herd in the Arctic National Wildlife Refuge (ANWR). It claims that it has been prominent in efforts to prevent oil drilling on the coastal plain of ANWR.

The governor and his executive staff in the Office of the Governor have been active in lobbying the United States Congress to open ANWR for oil and gas development. As part of that effort the Governor's Office hired a lobbying company, The Wexler Group.

Arctic Power is a nonprofit organization that promotes congressional and presidential approval of legislation opening ANWR. Arctic Power has received grants from the Alaska legislature to fund its lobbying efforts.[1] To further its goals, Arctic Power hired Decision Management, Inc. (DMI) to lobby United States senators.

---

1. See ch. 123, § 34(a), SLA 1996; ch. 103, § 90(a), SLA 1995.

The current dispute arose in November 1997 when Gwich'in submitted to the Office of the Governor a broad request for information relating to the promotion of oil development in ANWR—pursuant to Alaska's Public Records Act.[2]

The Office of the Governor produced most of the requested materials, but declined to produce thirteen documents, claiming that the deliberative process privilege and constitutional rights to privacy and association protected them from disclosure. Gwich'in appealed the nondisclosure to the governor's Chief of Staff, Jim Ayers.[3] Ayers concluded that the deliberative process privilege protected eight of the documents.

Gwich'in filed a superior court administrative appeal from the refusal to disclose the eight documents. In response, the Office of the Governor released one of the documents and moved to supplement the administrative record with an affidavit of John Katz, the Director of State/Federal Relations and Special Counsel to the Governor, to further explain why the privilege applied to the seven remaining documents. The superior court declined to consider the Katz affidavit and limited its appellate review to the administrative record. The superior court examined the documents in camera and concluded that the deliberative process privilege protected all seven of the disputed documents. In a thoughtful and thorough memorandum opinion, the superior court affirmed the Office of the Governor's decision to withhold the documents.

The superior court also determined that the Office of the Governor prevailed in the litigation and awarded it $1,000 in attorney's fees and paralegal costs.[4] The superior court consequently denied Gwich'in's motion for full attorney's fees.

Both parties appeal. Gwich'in appeals the deliberative process privilege ruling, the attorney's fees award against it, and the denial of its motion for full attorney's fees. The Office of the Governor contingently cross-appeals the denial of its motion to supplement the record with the Katz affidavit.

## III. DISCUSSION

### A. May the Office of the Governor Withhold the Documents?

#### 1. Standard of review

When a superior court acts as an intermediate court of appeal we give no deference to its decision.[5] The Office of the Governor urges us to give "considerable deference" to an agency's determination when deciding whether the deliberative process privilege applies, because it claims that an agency's expertise in determining the requisite level of confidentiality is necessary to prevent injury to the quality of agency decisions.[6] We are not persuaded that this case requires deference to the Office of the Governor.[7] We therefore apply our independent

---

**2.** *See* AS 09.25.110–.220. Gwich'in requested: (1) information on any 1998 fiscal year legislative appropriation to the Office of the Governor used to promote ANWR oil development; (2) all materials that addressed plans, efforts, budgets, expenditures, or possible future activities by various organizations, including Arctic Power, to promote oil development in ANWR, including cooperative or coordinated activities of the State of Alaska with those organizations; and (3) materials relating to communications between the Office of the Governor and the Department of Natural Resources, Arctic Power, labor union representatives, Alaska Native corporation representatives, the Alaska legislature, or others, addressing the promotion of oil leasing in ANWR.

**3.** *See* 6 Alaska Administrative Code (AAC) 96.350 (2000).

**4.** *See* Alaska R.App.P. 508(e).

**5.** *See* Alaska Wildlife Alliance v. Rue, 948 P.2d 976, 979 (Alaska 1997).

**6.** *See* Pfeiffer v. C.I.A., 721 F.Supp. 337, 340 (D.D.C.1989); Chemical Mfrs. Ass'n v. Consumer Prod. Safety Comm'n, 600 F.Supp. 114, 118 (D.D.C.1984). Because Alaska's deliberative process privilege is parallel to the privilege applied by federal courts in Freedom of Information Act cases, we have found federal law to be "instructive." *See* Capital Info. Group v. State, Office of the Governor, 923 P.2d 29, 35 n. 4 (Alaska 1996).

**7.** *Cf. Chemical Mfrs. Ass'n*, 600 F.Supp. at 118 (deferring to agency's determination of privilege for scientific data because study was underway, but noting that court would have accorded closer scrutiny and fuller disclosure after publication).

judgment in deciding the legal issues presented.[8]

### 2. Alaska's Public Records Act

The act provides that "[u]nless specifically provided otherwise, the public records of all public agencies are open to inspection by the public under reasonable rules during regular office hours,"[9] and that "[e]very person has a right to inspect a public record in the state."[10] We have noted that "[t]here is a strong public interest in disclosure of the affairs of government," and "[sections] .110 and .120 articulate a broad policy of open records."[11] The right of citizen access to public records has been characterized as a "fundamental right."[12]

The Public Records Act contains exceptions to the public disclosure mandate, including one for "records required to be kept confidential by ... state law."[13] To further the legislative policy of broad public access, we narrowly construe any exceptions.[14]

### 3. The deliberative process privilege

The deliberative process privilege is one of the judicially recognized "state law" exceptions under AS 09.25.120(a)(4).[15] Public

officials may assert this privilege and withhold documents when public disclosure would deter the open exchange of opinions and recommendations between government officials.[16] The privilege is intended to protect the executive's decisionmaking process, its consultative functions, and the quality of its decisions.[17]

Gwich'in maintains that this privilege only protects communications relating to constitutionally-prescribed executive powers and duties, as determined by article III of the Alaska Constitution. It reasons that the privilege stems from the executive privilege, which is based on the separation of powers doctrine.

We stated in *Capital Information Group v. State, Office of the Governor*[18] that we considered the terms "executive privilege" and "deliberative process privilege" to be synonymous for purposes of that discussion.[19] But the two terms are not identical.[20] Instead, the deliberative process privilege is a "branch" of a broader group of governmental privileges.[21] The roots of the deliberative process privilege lie in the common law; it protects the mental processes of government decisionmakers from interference, not constitutional notions of separation of powers.[22]

---

**8.** *See Capital Info. Group*, 923 P.2d at 33 n. 2 (citing *Jones v. Jennings*, 788 P.2d 732, 735 (Alaska 1990)) (affording no deference to trial court). This standard is applied appropriately to an administrative decision when it concerns the "analysis of legal relationships about which courts have specialized knowledge and experience." *Kelly v. Zamarello*, 486 P.2d 906, 916 (Alaska 1971).

**9.** AS 09.25.110(a).

**10.** AS 09.25.120(a).

**11.** *City of Kenai v. Kenai Peninsula Newspapers, Inc.*, 642 P.2d 1316, 1323–24 (Alaska 1982).

**12.** *Id.* at 1323 (quoting *MacEwan v. Holm*, 226 Or. 27, 359 P.2d 413, 421–22 (1961) (en banc)); *see also* ch. 200, § 1, SLA 1990 ("[P]ublic access to government information is a fundamental right that operates to check and balance the actions of elected and appointed officials and to maintain citizen control of government.").

**13.** AS 09.25.120(a)(4).

**14.** *See Capital Info. Group*, 923 P.2d at 33 (citing *Municipality of Anchorage v. Anchorage Daily*

*News*, 794 P.2d 584, 589 (Alaska 1990)); *see also Doe v. Alaska Superior Court*, 721 P.2d 617, 622 (Alaska 1986).

**15.** *See Capital Info. Group*, 923 P.2d at 33.

**16.** *See id.* (quoting Natalie A. Finkelman, Note, *Evidence and Constitutional Law*, 61 Temp. L.Rev. 1015, 1033 (1988)).

**17.** *See id.*

**18.** 923 P.2d 29 (Alaska 1996).

**19.** *See id.* at 34.

**20.** *See id.* at 34 n. 3, 36.

**21.** *See id.* at 36 (quoting Russell L. Weaver & James T.R. Jones, *The Deliberative Process Privilege*, 54 Mo. L.Rev. 279, 283–85 (1989) (footnotes omitted) [hereinafter Weaver & Jones] ).

**22.** *See id.* at 34 ("Unlike the common law based deliberative process privilege ... the executive privilege in [*U.S. v.*] *Nixon* [418 U.S. 683, 94

Therefore, the question is not whether the communication relates to a duty mandated in article III of the Alaska Constitution, but whether disclosure of the communication sought would affect the quality of governmental decisionmaking.

 To determine whether disclosure would interfere with that process, the proponent of the privilege must show as a threshold matter that the communication is both "predecisional" and "deliberative."[23] Once those requirements have been met, the court balances the public's interest in disclosure against the agency's interest in confidentiality.[24]

### a. *Predecisional*

 To qualify as predecisional, a communication must have been made before the deliberative process was completed.[25] The privilege protects predecisional communications because the quality of the communications received by the decisionmaker clearly affects the quality of the decisionmaking process.[26] The privilege does not protect postdecisional communications, but predecisional communications do not automatically lose the privilege after a decision has been made.[27]

### b. *Deliberative*

 The communication must also be deliberative.[28] It must reflect a "give-and-take" of the decisionmaking process and contain opinions, recommendations, or advice about agency policies.[29] Purely factual material is not protected unless the selection process or presentation would reveal the decisionmaking process, or if the facts are inextricably intertwined with that process.[30] Courts also consider the function and significance of the communication; documents representing ideas and theories that go into policymaking are distinguished from the opinions and interpretations that constitute the policy itself.[31]

### c. *The balancing test*

 If the agency demonstrates that a document is predecisional and deliberative, a presumptive privilege attaches in favor of nondisclosure.[32] The burden then shifts to the party seeking disclosure to show that the public's interest in disclosure outweighs the government's interest in shielding the information.[33] We recognize that "[i]n balancing the interests ... the scales must reflect the fundamental right of a citizen to have access to the public records as contrasted with the incidental right of the agency to be free from unreasonable interference."[34]

### 4. *Privilege application*

Gwich'in advances four main arguments which we address in turn.

### a. *Did the administrative decision allow Gwich'in to meaningfully challenge the assertion of privilege?*

 Gwich'in first argues that the initial decision by the Office of the Governor is

S.Ct. 3090, 41 L.Ed.2d 1039 (1974)] was deemed constitutionally required by the separation of powers doctrine."); *see also City of Colorado Springs v. White*, 967 P.2d 1042, 1047–48 (Colo. 1998); *Kaiser Aluminum & Chem. Corp. v. United States*, 141 Ct.Cl. 38, 157 F.Supp. 939, 945–47 (1958) (discussing purposes for limiting discovery of government officials' deliberative processes); *see also* Weaver & Jones, *supra* note 21, at 315.

23. *See Capital Info. Group*, at 35–36; *see also City of Colorado Springs*, 967 P.2d at 1051.

24. *See Capital Info. Group*, 923 P.2d at 36.

25. *See* Weaver & Jones, *supra* note 21, at 290.

26. *See City of Colorado Springs*, 967 P.2d at 1051 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151–52, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)).

27. *See Capital Info. Group*, 923 P.2d at 35–36.

28. *See id.* at 36.

29. *See id.* (citations omitted).

30. *See id.* (citation omitted).

31. *See City of Colorado Springs*, 967 P.2d at 1052.

32. *See Capital Info. Group*, 923 P.2d at 37.

33. *See id.*

34. *Id.* (quoting *City of Kenai v. Kenai Peninsula Newspapers, Inc.*, 642 P.2d 1316, 1323 (Alaska 1982)) (quoting *MacEwan v. Holm*, 226 Or. 27, 359 P.2d 413, 421–22 (1961)).

facially inadequate to sustain the privilege because the decision failed to state sufficient reasons for withholding the documents and therefore did not satisfy requirements stated in regulation and case law.

The Office of the Governor promulgated 6 Alaska Administrative Code (AAC) 96.350 (2000), which requires that an administrative appeal determination of a Public Records Act request denial "must be in writing, must specify the specific statute, regulation, or court decision that is the basis for the denial, and must state briefly the reason for the denial." We have never addressed what an agency must show to invoke the privilege under 6 AAC 96.350.[35]

In *City of Colorado Springs v. White*,[36] the Colorado Supreme Court thoroughly discussed what an agency must do to invoke the privilege successfully following a public records act request. The court there adopted the well-established procedure federal agencies must follow to protect documents from disclosure under the Freedom of Information Act.[37] Under federal law, an agency must assert the privilege by preparing a "Vaughn index."[38] The court stated that the index should (1) describe specifically each document claimed to be privileged, noting its author, recipient, and subject; (2) explain how each document qualifies for the privilege, describing the deliberative process to which the document is related and the role the document played in that process; (3) include an affidavit discussing why disclosure would be harmful; and (4) describe which portions of large documents are and are not subject to disclosure.[39]

The requirements of 6 AAC 96.350 are not as extensive as the requirements for a "Vaughn index," but the purpose is the same—to "provide litigants with fundamental information about the allegedly privileged material, and provide them with a meaningful opportunity to challenge the government's claims."[40] When it initially denied Gwich'in access to the documents, the Office of the Governor provided information about each document's author, subject matter, date, length, and reason for nondisclosure. Ayers's written determination of the administrative appeal listed the specific documents, the reasons for nondisclosure, and the legal authority for nondisclosure. The Office of the Governor therefore complied with 6 AAC 96.350. Moreover, the superior court's in camera review and the full briefing before that court allowed Gwich'in a meaningful opportunity to challenge the claim of privilege.[41]

Because we hold that the administrative decision and the superior court's in camera review were sufficient, we do not need to address the Office of the Governor's cross-appeal.

> b. *Did the Office of the Governor establish that the documents fall under the privilege?*

Gwich'in next argues that the Office of the Governor fails to meet the threshold require-

---

**35.** In *Doe v. Alaska Superior Court* we required the state on remand to identify specific documents and to explain why they fell within the scope of the executive privilege because the state had objected to disclosing an entire file, not just specific documents within the file. *See Doe*, 721 P.2d at 626. Contrary to Gwich'in's reading of *Doe*, this requirement does not place a "heavy" burden upon the state to detail why the documents should not be furnished. Gwich'in also relies on *Capital Information Group*, but that case discussed the state's "burden" at the balancing-of-interests stage, not the level of detail required when the agency makes its written determination. *See Capital Info. Group*, 923 P.2d at 36 (quoting Weaver & Jones, *supra* note 21, at 315).

**36.** 967 P.2d 1042 (Colo.1998).

**37.** *See id.* at 1053–54. That case decided an appeal of a trial court's grant of an order to show cause why documents should not be disclosed; it was not an appeal of an administrative decision. *See id.* at 1045.

**38.** *See id.* at 1053 (citing *Vaughn v. Rosen*, 484 F.2d 820, 826–27 (D.C.Cir.1973)).

**39.** *See id.*

**40.** *Id.* at 1053–54 (citations omitted).

**41.** *See id.* at 1057. Because the Colorado court had not previously specified the procedural requirements for asserting the privilege, that court held that the trial court's in camera review of the documents was "more than an adequate substitute for an evaluation of a Vaughn index." *Id.*

ments of the privilege. The documents fall into three categories: (1) three memoranda from Decision Management Inc. (DMI), a lobbying company, to the Office of the Governor regarding lobbying strategies; (2) a draft media plan from The Wexler Group, another lobbying company, to the Office of the Governor; and (3) three e-mail communications between staffers in the Office of the Governor regarding how the state might proceed with the proposed media plan.

### (i) *Decision Management, Inc. memoranda*

■ The Office of the Governor withheld an eleven-page February 4, 1997, memorandum to John Katz from DMI regarding "Congressional passage of ANWR bill." It also withheld two five-page February 26, 1997, memoranda from DMI to Katz regarding the same subject.

■ Gwich'in first argues that nothing in the administrative record establishes that the DMI memoranda were directly solicited. To qualify for the privilege, the communication or document at issue must be an "internal communication" or one "directly *solicited*" by a government official.[42] Outside consultants' reports have been held to be privileged if the agency uses them in its decisionmaking process.[43]

After reviewing the February 4, 1997, memorandum, we conclude that the document establishes that it was "directly solicited." The Office of the Governor clearly invited DMI to submit a proposal and DMI responded. The February 26, 1997, memoranda were merely addenda to that proposal and therefore were also directly solicited.

Second, Gwich'in argues that the three DMI memoranda are not predecisional because no specific decision was identified; the memoranda were incorporated by reference in a document disclosed by the state, a contract between Arctic Power and DMI; and the memoranda relate to an agreement beyond the decisionmaking capacity of the executive, namely a contract between two private parties.

■ No specific decision needs to be identified for a document to be predecisional.[44] The privilege protects the give-and-take deliberative process, not final decisions; no ultimate conclusion needs to be identified, or even reached, for the privilege to attach.

■ Documents that are incorporated by reference or expressly adopted in a final decision by an agency may lose their predecisional status.[45] Here the DMI memoranda were incorporated by reference into DMI's private contract with Arctic Power. Incorporating an otherwise privileged document into a private contract cannot be a basis for the loss of that privilege because that contract is not the agency's final decision.[46]

We conclude that the DMI memoranda are both predecisional and deliberative. As Gwich'in notes, the decision about whether Arctic Power would contract with DMI was beyond that office's authority, but we conclude that DMI submitted the memoranda in February 1997 as proposals "suggesting a strategy for public information and lobbying campaigns to be overseen by Arctic Power." Although DMI ultimately contracted with Arctic Power, the DMI memoranda are inextricably intertwined with the proposed lobbying plans of the Office of the Governor; those plans may have included using Arctic Power

---

42. *Capital Info. Group*, 923 P.2d at 35 (quoting *Doe*, 721 P.2d at 625).

43. *See City of Colorado Springs*, 967 P.2d at 1057 (holding that outside consultant's evaluation of working environment and policies was privileged because report contained observations on current atmosphere and suggestions on how to improve division rather than expression of final agency decision); *Daily Gazette Co. v. West Va. Dev. Office*, 198 W.Va. 563, 482 S.E.2d 180, 192 (1996) (holding that deliberative process privilege protects written advice, opinions, and recommendations to public body from outside

consultants obtained during public body's decisionmaking process); *see also Doe*, 721 P.2d at 624–25 (discussing decisionmaker's need for candid advice and "freedom to think out loud").

44. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n. 18, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

45. *See* Weaver & Jones, *supra* note 21, at 293–94.

46. *See Sears*, 421 U.S. at 152–54, 95 S.Ct. 1504.

to lobby for it.[47] The privilege therefore serves to protect the very process at issue here—the deliberative consideration of proposals which were not adopted.

### (ii) *The draft media plan*

■ The Office of the Governor also withheld a November 25, 1997 "[d]raft media plan for ANWR from Wexler Group to John Katz." The Wexler Group had originally contracted with the state in September 1995 to lobby for opening ANWR for oil and gas development. That contract was extended through June 1998.

First, Gwich'in argues that the administrative record fails to show that the media plan was directly solicited. Unlike the DMI memoranda, the draft media plan itself does not establish that the Office of the Governor directly solicited the plan from The Wexler Group. But we conclude that other documents withheld by the Office of the Governor—the e-mails between David Ramseur and John Katz—do establish that the draft media plan was directly solicited.

Second, Gwich'in reasons that the privilege protects nongovernmental, directly solicited documents because disclosure would tend to silence informants who provide confidential information. It concludes that disclosure here would have no such chilling effect because the Wexler Group was contractually obligated to provide information. But the privilege does apply in this context, because disclosure might chill "honest and frank communications" between hired consultants and the agency.[48]

Third, Gwich'in claims the media plan is not predecisional to the decision to undertake a media campaign, a decision made when the Office of the Governor hired The Wexler Group in 1995. Even though that decision had already been made, the draft plan is the kind of communication that the privilege protects—a preliminary communication that reflects the give-and-take deliberation of an executive agency. Ongoing deliberation continued on how to effectuate the Office of the Governor's goal of opening ANWR by lobbying Congress in a variety of ways, including deliberation on what media strategy to use. The primary characteristic of the media plan is predecisional.[49] Disclosure could chill planning strategy and communicating with hired consultants.

### (iii) *The e-mails*

■ In June 1997 David Ramseur, the governor's Deputy Chief of Staff, and John Katz wrote three e-mail messages about hiring a media consultant.

Gwich'in argues that the e-mails were not predecisional because the Office of the Governor did not identify a decision and because the decision to undertake a media campaign had already been made. A specific decision need not be identified for the privilege to attach, and decisions were ongoing regarding the Office of the Governor's lobbying strategies.[50]

■ Gwich'in also argues that the e-mails were not deliberative because the privilege only protects communications from subordinates. Communications from a senior to a subordinate are not necessarily postdecisional.[51] These three messages reflect the give-and-take deliberative process of arriving at a decision. None reflects any directive on how to implement a particular plan or course of action from a senior to a junior employee; instead, each shows ongoing discussion and deliberation about whether to hire a media consultant and whom to hire. Our review of these three messages shows that they were all predecisional and deliberative.

---

47. *See* ch. 123, § 34(a), SLA 1996; ch. 103, § 90(a), SLA 1995.

48. *City of Colorado Springs*, 967 P.2d at 1057.

49. *See Sears*, 421 U.S. at 152 n. 19, 95 S.Ct. 1504 (stating that if communication has both predecisional and postdecisional functions, communication's primary character and risks of disclosure should be determinative).

50. *See id.* at 151 n. 18, 95 S.Ct. 1504.

51. *See* Weaver & Jones, *supra* note 21, at 292 ("[D]ownstream communications are not always postdecisional. If they do in fact precede the decision, as when they involve a discussion between superior and subordinate about what the appropriate policy ought to be, a downstream communication may be predecisional.").

The Office of the Governor's determination and our in camera review establish both threshold requirements for all seven withheld documents. We therefore hold that the privilege presumptively attached and that Gwich'in was obliged to show that its need for the documents outweighed the Office of the Governor's interest in secrecy.

### c. Has the privilege evaporated?

■ Before it addresses the balancing of interests, Gwich'in argues, citing a Washington case,[52] that the privilege evaporates when the decision that the documents preceded is finally made. It argues that because over a year has passed, all the decisions relating to the withheld documents must have been implemented already.

The question is not whether the decision has been implemented, or whether sufficient time has passed, but whether disclosure of these preliminary proposals could harm the agency's future decisionmaking by chilling either the submission of such proposals or their forthright consideration.[53] Disclosing proposals made—but not adopted—could chill the possible future adoption of those or similar proposals, or the relationships between the Office of the Governor and its lobbyists. We therefore hold that the communications have not lost the privilege.

### d. Does the public interest in disclosure outweigh the interests in non-disclosure?

■ Finally, Gwich'in argues that the documents relate to the "fate of the Gwich'in's culture and way of life" and that the public has a proprietary interest in the expenditure of over a million dollars of state funds. It further claims that the Office of the Governor's interest is weaker when the documents relate to political lobbying and not to an essential executive branch function.

The Office of the Governor argues that Gwich'in failed to produce any evidence it had a particular interest in disclosure, and that the public has an interest only in how funds are actually spent, not how they might have been spent. It counters Gwich'in's "essential executive function" argument by citing Capital Information Group, which allowed the privilege for documents unrelated to the constitutionally mandated executive activity of policymaking.[54]

■ When balancing the interests in Capital Information Group, we held that agency proposals submitted to the governor fell under the privilege. We explained:

> [The Governor] is formulating his own political legislative package which will reflect his own priorities and agenda. In doing so, he must determine not only which of the agency proposals have merit but also which warrant the expenditure of his own political capital in their pursuit. This is one of the most sensitive and important functions that the Governor performs while in office, and the need for frank discussion of policy matters among the Governor's advisors is perhaps greater here than in any other area ... the need for effective decisionmaking in the Governor's office in the formulation of his legislative agenda is not overcome by [the requestor's] desire to "shed light on the needs of the agencies." [55]

Gwich'in's attempt to resurrect its "essential executive function" argument in the balancing test therefore fails. The privilege may protect any governmental decisionmaking function, including the governor's policymaking and lobbying of either state or federal government.

---

52. Progressive Animal Welfare Soc'y v. University of Wash., 125 Wash.2d 243, 884 P.2d 592, 600 (1994).

53. See Capital Info. Group, 923 P.2d at 36; see also Weaver & Jones, supra note 21, at 292–93 ("Documents which are predecisional in nature retain their protection even after the decision is made.").

54. The Office of the Governor also asserts that Gwich'in failed to argue at the administrative level that the balance of interests favored disclosure and therefore waived any balancing argument. This waiver argument fails. Gwich'in could not have argued the balancing prong of the privilege at the agency level because the agency appeal afforded no opportunity for briefing.

55. Capital Info. Group, 923 P.2d at 38.

■ Generally, it is difficult for a requestor to override a presumptive privilege.[56] Relevant factors include: the degree of confidentiality and sensitivity of the communication; the time elapsed after deliberation concluded and after communications were made; and whether deliberation is ongoing.[57]

Here, even though two years have passed and the communications do not appear to be highly sensitive, the scales tip in favor of nondisclosure. The governor's national political agenda for the state is no less important than the governor's state political agenda, a topic we discussed in *Capital Information Group.* And while the public has an interest in how the state spends public money, it has less interest in knowing how the state might have spent public money, but did not. Finally, Gwich'in has a great interest in maintaining its way of life and culture, but it can conduct its own lobbying efforts to advance that interest.

We therefore hold that the deliberative process privilege protects all seven disputed documents.

### B. *Attorney's Fees*

The superior court awarded the Office of the Governor $1,000 in appellate attorney's fees and paralegal costs under Appellate Rule 508(e), and summarily denied Gwich'in's motion for attorney's fees. In doing so, it found that the Office of the Governor was the prevailing party.

■ Gwich'in claims that it was the prevailing party because the Office of the Governor released one of the eight documents it originally withheld. We review the superior court's prevailing-party determination for abuse of discretion.[58] To decide which party prevails, the court must "deter-

mine, in an overall sense, which party the decision favors." [59] We have upheld a superior court's conclusion that a requestor of information was not a prevailing party when the requestor was granted access to some documents but was denied access to others held to be privileged.[60]

■ Here the superior court affirmed the withholding of the seven disputed documents and decided that the agency was the prevailing party. Even though Gwich'in may have induced the release of an eighth document, the state's withholding of the seven documents was the main issue in the appeal to the superior court.[61] The superior court therefore did not abuse its discretion by determining that the Office of the Governor was the prevailing party.

Gwich'in next argues that because it qualifies as a public interest litigant, it was an abuse of discretion to award partial attorney's fees against it. The Office of the Governor counters that Gwich'in failed to establish public interest litigant status by evidence or affidavit.

■ We review the superior court's resolution of the public interest litigant status issue for abuse of discretion.[62] A party claiming this status must satisfy all four elements of the public interest litigant test: (1) that the case is designed to effectuate strong public policy; (2) that numerous people will benefit from the successful litigation; (3) that only a private party can have been expected to bring the suit; and (4) that the party does not have sufficient economic interest to otherwise bring suit.[63] Although Gwich'in did not file affidavits or exhibits supporting its claim of public interest litigant status, its failure to do so is not fatal.

---

56. *See* Weaver & Jones, *supra* note 21, at 319.

57. *See* Weaver & Jones, *supra* note 21, at 317–18.

58. *See Alaska Wildlife Alliance v. Rue,* 948 P.2d 976, 981 (Alaska 1997); (*Hickel v. Southeast Conference,* 868 P.2d 919, 927–28 (Alaska 1994)).

59. *Alaska Wildlife Alliance,* 948 P.2d at 981 (citing *Hickel,* 868 P.2d at 925).

60. *See id.*

61. *See Buza v. Columbia Lumber Co.,* 395 P.2d 511, 514 (Alaska 1964) (prevailing party "is one who successfully prosecutes the action or successfully defends against it, prevailing on the main issue ... the one in whose favor the decision or verdict is rendered and the judgment entered").

62. *See Kachemak Bay Watch, Inc. v. Noah,* 935 P.2d 816, 821 (Alaska 1997).

63. *See id.* at 827.

In *Kachemak Bay Watch, Inc. v. Noah,*[64] we discussed how a court must determine public interest litigant status. There the opponents presented evidence that three members of Kachemak Bay Watch (KBW) had an economic incentive to sue and KBW failed to refute this evidence.[65] We upheld the decision to deny public interest litigant status because the superior court had "reasonably based its decision on the economic incentives of the KBW members about whom it had more detailed information."[66]

Gwich'in provided the superior court detailed information relevant to the public interest litigant issue. Its attorney's fees motion argued that Gwich'in met all four elements of the public interest litigant test. Its opposition to the Office of the Governor's motion for attorney's fees again asserted that Gwich'in sought the records as a public interest litigant and had no financial interest in the litigation. Unlike the party opposing KBW's claim of public interest litigant status, the Office of the Governor did not provide *more* detailed information than Gwich'in to rebut Gwich'in's assertion of public interest litigant status, but instead simply relied on briefing arguments. Gwich'in's failure to submit formal evidence or affidavits therefore did not doom its fees arguments.

We next consider whether it was an abuse of discretion to award attorney's fees against Gwich'in.[67] Gwich'in claimed that it was acting on behalf of the Gwich'in people to gain access to information under the Public Records Act and to challenge the failure to disclose requested documents.[68] We have previously held that a suit brought to ensure compliance with statutory and constitutional policies that concern the public as a whole effectuates strong public policies.[69] Because open access to public records is a "fundamental right,"[70] we conclude that Gwich'in's administrative appeal effectuated strong public policies.

Many people share the Gwich'in Steering Committee's views on developing ANWR. Many people therefore might have benefitted had the disclosure effort succeeded, given the likelihood that disclosure would have hampered pro-development lobbying.[71]

Because the Office of the Governor withheld the documents, only a private, nongovernmental party could reasonably have been expected to request this information to further Gwich'in's goal of ensuring compliance with the Public Records Act.[72]

Finally, the Gwich'in Steering Committee is a nonprofit, tribal-based organization whose administrative appeal sought access to information, not money or other economic advantage. Although the Office of the Governor argues that the Gwich'in has an economic interest in the caribou it seeks to protect, we have held that "a group partially motivated by a threat to its subsistence lifestyle did not have sufficient economic incentive to sue" and that "a more substantial financial interest is required"[73] to defeat a claim of public litigant status.

We therefore hold that it was an abuse of discretion to award attorney's fees against Gwich'in.

## IV. CONCLUSION

Because the seven disputed documents are all predecisional and deliberative, and be-

64. 935 P.2d 816 (Alaska 1997).

65. *See id.* at 828.

66. *Id.*

67. *See id.* at 821 (reviewing superior court's decision on public interest litigant status and attorney's fees for abuse of discretion).

68. *See* AS 09.25.110, .120; *see also Capital Info. Group v. State, Office of the Governor,* 923 P.2d 29, 33 (Alaska 1996); *City of Kenai v. Kenai Peninsula Newspapers, Inc.,* 642 P.2d 1316, 1323 (Alaska 1982).

69. *See Eyak Traditional Elders Council v. Sherstone, Inc.,* 904 P.2d 420, 424–25 (Alaska 1995).

70. *See City of Kenai,* 642 P.2d at 1323.

71. *See Eyak Traditional Elders Council,* 904 P.2d at 425.

72. *See id.*

73. *See id.* at 426 (quoting *Alaska Survival v. State, Dep't of Natural Resources,* 723 P.2d 1281, 1292 (Alaska 1986)).

cause Gwich'in's need for the documents does not outweigh the interest of the Office of the Governor in preventing interference with its decisionmaking process, we AFFIRM the superior court decision affirming the administrative decision withholding the documents as privileged. But because Gwich'in was a public interest litigant, we VACATE the award of attorney's fees against it.